12 CIV 6880

383-12/MEU/LJK
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
CROSSBRIDGE PROJECTS LIMITED
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Michael E. Unger
Lawrence J. Kahn

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CROSSBRIDGE PROJECTS LIMITED,

          Plaintiff,

-against-

IOF PTE LTD SINGAPORE; BHATIA INTERNATIONAL LTD INDORE a/k/a BHATIA INTERNATIONAL LTD.; BHATIA INTERNATIONAL PTE LTD; BHATIA GLOBAL TRADING LTD.; FLEETMAR SHIPPING COMPANY LIMITED; GURU CORPORATION LIMITED; INDORE CORPORATION LIMITED; PATRIOTIC SERVICES INCORPORATED; GREGARIOUS ESTATE INCORPORATED; and JOHN DOE CORPORATIONS 1-10,

          Defendants.

12 CV

VERIFIED COMPLAINT



RECEIVED SEP 11 2012 U.S.D.C. S.D.N.Y. CASHIERS

---

    Plaintiff, CROSSBRIDGE PROJECTS LIMITED ("CROSSBRIDGE"), as and for its Verified Complaint against Defendants IOF PTE LTD SINGAPORE ("IOF"), BHATIA INTERNATIONAL LTD INDORE a/k/a BHATIA INTERNATIONAL LTD. ("BHATIA"), BHATIA INTERNATIONAL PTE LTD ("BHATIA PTE"), BHATIA GLOBAL TRADING LTD. ("BHATIA GLOBAL"), FLEETMAR SHIPPING COMPANY ("FLEETMAR"), GURU CORPORATION LIMITED ("GURU"), INDORE CORPORATION LIMITED ("INDORE"),

390536.1                                                   1

PATRIOTIC SERVICES INCORPORATED ("PATRIOTIC"), GREGARIOUS ESTATE INCORPORATED ("GREGARIOUS") and JOHN DOE CORPORATIONS 1-10 (each a "JOHN DOE" until later identified), alleges upon information and belief as follows:

### Jurisdiction

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

### The Parties

2. At all times material hereto, Plaintiff CROSSBRIDGE was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Mauritius.

3. At all times relevant hereto, Defendant IOF was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore. IOF's address is shared with BHATIA and IOF is a wholly owned subsidiary of one of BHATIA's shareholders and serves as a vessel chartering arm of BHATIA and is merely an alter ego of BHATIA.

4. At all times relevant hereto, Defendant BHATIA was and still is a business entity organized and existing under the laws of a foreign country with an address at 8/5, Navratan Bagh, Manorama Ganj, Indore, Madhya Pradesh, 452001 India and an additional

address at 138 Cecil Street, Singapore. BHATIA serves as the coal trading arm of the various Bhatia Group companies.

5. At all times relevant hereto, BHATIA PTE was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore. This address is shared with the other defendants in this action, and BHATIA PTE serves as the vessel owning and operating arm of the Bhatia Group of companies and owns and/or operates vessels through its wholly owned subsidiaries which are also defendants in this action, and BHATIA PTE is merely an alter ego of BHATIA.

6. At all times relevant hereto, BHATIA GLOBAL was and still is a business entity organized and existing under the laws of a foreign country with an address at 8/5, Navratan Bagh, Manorama Ganj, Indore, Madhya Pradesh, 452001 India and an additional address at 138 Cecil Street, Singapore. These addresses are shared with the other defendants in this action, and BHATIA GLOBAL is merely a holding company that exists to hold shares in BHATIA and BHATIA PTE, and BHATIA GLOBAL is merely an alter ego of BHATIA.

7. At all times relevant hereto, Defendant FLEETMAR was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore, that is shared with BHATIA and the other Defendants. FLEETMAR is merely an alter ego of BHATIA which uses FLEETMAR to own or operate the MV ASHKNEER (ex-HARKRIPA, ex-FLORA).

8. At all times relevant hereto, Defendant GURU was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore, that is shared with BHATIA and the other Defendants. GURU is a wholly owned

subsidiary of BHATIA and is merely an alter ego of BHATIA which uses GURU to own or operate the MV GURASIS.

9. At all times relevant hereto, Defendant INDORE was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore, that is shared with BHATIA and the other Defendants. INDORE is a wholly owned subsidiary of BHATIA and is merely an alter ego of BHATIA which uses INDORE to own or operate the MV PRIDE OF INDORE.

10. At all times relevant hereto, Defendant PATRIOTIC was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore, that is shared with BHATIA and the other Defendants. PATRIOTIC is a wholly owned subsidiary of BHATIA and is merely an alter ego of BHATIA which uses PATRIOTIC to own or operate the MV SHER-E PUNJAB.

11. At all times relevant hereto, Defendant GREGARIOUS was and still is a business entity organized and existing under the laws of a foreign country with an address at 138 Cecil Street, Singapore, that is shared with BHATIA and the other Defendants. GREGARIOUS is a wholly owned subsidiary of BHATIA and is merely an alter ego of BHATIA which uses GREGARIOUS to own or operate the MV VEENUS.

12. At all times relevant hereto, the JOHN DOEs are, on information and belief, other foreign business entities which cannot be found in this District for purposes of Rule B but which are also alter egos of BHATIA or will be alter egos of BHATIA that BHATIA will create or utilize in an effort to avoid payment of the damages owed to CROSSBRIDGE as a result of the matters set out below.

13.     Collectively, the Defendants have engaged in an ongoing shell game of shifting assets, names and alliances in order to frustrate or otherwise defraud creditors including CROSSBRIDGE. Such related party transactions and shell games, coupled with the interconnected structure of the Defendants, demonstrates that the various entities within the group are merely alter egos of one another and should be held jointly and severally liable to CROSSBRIDGE for the matters set out below.

### The Dispute

14.     On or about January 30, 2010, CROSSBRIDGE entered into a maritime contract of affreightment (the "COA") on the Americanized Welsh Coal Charter Form (as amended) as owner with IOF as charterer for the carriage of eight cargoes per year from certain ports or places in Indonesia to certain ports or places in India, with each shipment to be 50,000 metric tons of coal, 10% more or less in owner's option. A copy of the COA, which contains additional terms and conditions, is annexed hereto as Ex. A.

15.     Performance of the COA was guaranteed by BHATIA. See Ex. A.

16.     On or about January 21, 2011, an addendum to the COA was added which made adjustments to the timing of the liftings and the charges to be incurred, among other matters. A copy of the addendum is annexed hereto as Ex. B.

17.     CROSSBRIDGE performed all of its obligations under the COA.

18.     IOF failed to perform its obligations under the COA and is in breach.

19.     Although IOF nominated cargoes for sailings by the MV MARITIME HARMONY, MV GRAZIA BOTTIGLIERI and MV DIANE, IOF failed to make shipments within the laycan dates for these vessels and also failed to make a shipment on the eighth lifting under the COA.

20. As a direct result of IOF's breach of the COA, CROSSBRIDGE suffered damages of $302,000 on the first failed lifting, $534,072 on the second failed lifting, $522,466 on the third failed lifting, and $533,733 on the fourth failed lifting (i.e., liftings 4, 5, 6 and 8), for a total of $1,892,271.

21. Despite due demand, IOF has refused or otherwise failed to pay these damages as required under the COA.

22. CROSSBRIDGE also invoked the guarantee and demanded payment or performance from IOF's guarantor, BHATIA, but BHATIA refused or otherwise failed to pay or perform.

### Arbitration

23. The COA provides for the application of English law and any dispute arising thereunder is to be referred to arbitration in London, and Plaintiff CROSSBRIDGE specifically reserves its right to arbitrate the substantive matters at issue.

24. CROSSBRIDGE has duly demanded arbitration against IOF and BHATIA but to date neither IOF nor BHATIA have responded to the arbitration demand.

25. This action is brought to obtain security in favor of Plaintiff CROSSBRIDGE in respect to its claims against Defendants and in aid of London arbitration proceedings which have now commenced.

26. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

27. This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the

London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

28. Plaintiff estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will amount to no less than $250,000, including any appeal of any arbitration award issued.

29. Interest anticipated to be awarded on the principal sums now due to Plaintiff is estimated to be $281,724.68 (calculated at the rate of 7% per annum compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

30. In all, the claim for which Plaintiff CROSSBRIDGE sues in this action, as near as presently may be estimated, totals **$2,423,995.68**.

### Alter Ego

31. Notwithstanding their formal separate incorporations, the defendants are in fact actually a single business enterprise pursuing a single business through nominally separate business structures all subject to the command and control of BHATIA (collectively, the "Bhatia Group").

32. The Defendants ownership and control is so intertwined and fused that the Defendants collectively form a single unit. The legal corporate separateness of these entities is not respected by the Defendants and so should be disregarded by this Court.

33. The Defendants have an extensive history of disregarding the corporate separateness of one another (particularly those entities that exist only to own or operate vessels) for the purpose of transferring or concealing assets to frustrate or otherwise defraud creditors.

34. Prior to mid-2009, a company called Ishhar Overseas FZE ("Ishhar") conducted vessel related activities for BHATIA and was a wholly owned subsidiary of BHATIA. However,

in 2009, Ishhar faced substantial claims for non-pyment of charter hire and BHATIA simply shut down Ishhar's operations and created IOF to conduct vessel chartering and management (some of which BHATIA did directly under the name "Bhatia International Limited"). That legerdemain also provided cover for the transfer, without adequate consideration, of over $85 million from Ishhar to BHATIA as is reflected in BHATIA's 2011 Financial Statement which provides that on 31 July 2009, BHATIA:

> Issued 48,200 ordinary shares to Ishhar Overseas FZE, Dubai for consideration of US$85,827,458…[and] on 9 November 2009 Ishhar Overseas FZE, Dubai sold 48,200 ordinary shares to Bhatia Holding Pte. Ltd. for a total consideration of US$402,952.

See Ex. C at 70. When it was important to effectively strip Ishhar of assets that could potentially be reached by Ishhar's creditors, BHATIA took all of Ishhar's property – in excess of $85 million – in exchange for shares that BHATIA reacquired three months later for a mere $400,000.

35. On the most basic level, the Defendants have overlapping ownership structures. BHATIA's shares are held by members of the Bhatia family and by other companies within the BHATIA group.

36. One major BHATIA shareholder is BHATIA GLOBAL which, in turn, is the largest shareholder in BHATIA PTE. BHATIA PTE's other two shareholders are BHATIA and another company called BIL Holding Pte Ltd. ("BIL Holding").

37. All of the other defendants are wholly owned subsidiaries of BIL Holding, BHATIA or BHATIA PTE.

38. BHATIA's managing director is Surinder Singh Bhatia who is also a major shareholder and a director of BHATIA PTE. Indeed, the 2011 Financial Statement for BHATIA PTE and its subsidiaries (Ex. C) identifies Surinder Singh Bhatia as one of only two directors for

BHATIA PTE and provides that BHATIA PTE shares a common director with IOF (Ex. C at 6, 43).

39. Control of FLEETMAR, GURU, INDORE, PATRIOTIC and GREGARIOUS is entirely through persons who are also affiliated with BHATIA, BHATIA PTE, BHATIA GLOBAL and/or BIL Holding.

40. All the defendants share the 138 Cecil Street, Singapore address.(Ex. C at 23).

41. Documents concerning loan facilities extended to PATRIOTIC and GREGARIOUS direct that all notices for those entities should be sent to BHATIA PTE in Singapore. (Ex. D).

42. Likewise, P&I insurance records for the vessels nominally owned by FLEETMAR, GURU and INDORE identify BHATIA PTE – not their owners – as being the point of contact for the insureds. (Ex. E).

43. BHATIA and BHATIA PTE regularly guarantee the debts and performance obligations of the other Defendants, and do so without any indication of an arm's length agreement supporting such guarantees.

44. Here, BHATIA guaranteed IOF's performance of the COA. There is no evidence that this guarantee was provided for adequate consideration or pursuant to any arm's length transaction.

45. Both BHATIA PTE and BHATIA issued guarantees to secure a loan from Standard Chartered Bank to FLEETMAR to purchase the ASHKNEER (ex-HARKRIPA). (Ex. C at 72). There is no evidence that these guarantees were provided for adequate consideration or pursuant to any arm's length transaction.

46. Both BHATIA PTE and BHATIA issued guarantees to secure a loan from Bank of Baroda to GURU for purchasing the GURASIS. (Ex. C at 72). There is no evidence that these guarantees were provided for adequate consideration or pursuant to any arm's length transaction.

47. Both BHATIA PTE and BHATIA issued guarantees to secure a loan from the State Bank of India to INDORE for purchasing the PRIDE OF INDORE. (Ex. C at 73). There is no evidence that these guarantees were provided for adequate consideration or pursuant to any arm's length transaction.

48. BHATIA PTE issued guarantees to secure loans from the Bank of Scotland to PATRIOTIC and GREGARIOUS for purchasing the SHER-E PUNJAB and the VEENUS. (Ex. C at 73). BHATIA also issued a guarantee regarding one or both of these vessels. There is no evidence that these guarantees were provided for adequate consideration or pursuant to any arm's length transaction.

49. BHATIA and BHATIA PTE regularly use property belonging to other entities in the Bhatia Group as communal property. For instance, over $85 million of Ishhar's property was transferred to BHATIA PTE for inadequate consideration. Likewise, an Ishhar-owned villa in Dubai was mortgaged as cross-collateral for the loan used by FLEETMAR to purchase the MV ASHKNEER (ex-HARKRIPA) (Ex. C at 72).

50. Likewise, Ishhar (rather than any of the nominal vessel owners) maintains the hull and machinery insurance policies for the GURASIS, ASHKNEER, and PRIDE OF INDORE. (Ex. E).

51. Similarly BHATIA PTE and BHATIA routinely take steps to ensure that they retain ultimate control over the vessels that are nominally owned by their dominated subsidiaries.

52. For instance, loan documents concerning FLEETMAR's purchase of the MV ASHKNEER (ex HARKRIPA, ex-FLORA) provide that BHATIA's predecessor (Ishhar) would bareboat charter the vessel from FLEETMAR and that BHATIA would then time charter the vessel from BHATIA PTE. (Ex. F at 3).

53. BHATIA PTE and BHATIA were thereby the real parties in interest for the loan and purchase involving the ASHKNEER. (Ex. C at 44, showing also that for both 2010 and 2011 the group-level freight income equaled BHATIA PTE's freight income, meaning that every penny of freight was paid to BHATIA PTE rather than to its subsidiaries which only nominally own the concerned vessels).

54. Likewise, BHATIA PTE is the ship manager for the ASHKNEER, GURASIS, PRIDE OF INDORE, and VEENUS. Despite this, there is no evidence of any written ship management contract for any of these vessels nor is there any evidence of payment of a management fee or other payment

55. Accordingly, BHATIA PTE and/or BHATIA exercise outright control over the vessels and the shell companies that nominally own the ships.

56. The defendants also make payments on behalf of one another without adequate consideration or arm's length transactions.

57. For instance, BHATIA PTE has made payments under a COA with another company, D/S Norden A/S, even though the contractual counterparty was BHATIA. Likewise, BHATIA PTE also made payments on a second COA with D/S Norden A/S even though the counterparty was IOF. See Verified Complaint ¶53 in *D/S Norden A/S v. IOF Pte. Ltd.*, 12 CIV 6030 (PAE) (S.D.N.Y.).

58. Similarly, BHATIA GLOBAL, a non-party to a COA with yet another company, Harmony Innovation Shipping Limited, issued a letter of indemnity to Harmony in exchange for the release of cargo without presentation of original bills of lading to the vessel's master. This letter of indemnity was issued on BHATIA GLOBAL letterhead, which lists the same corporate office as BHATIA. *See* Verified Complaint ¶46 and Ex. 8 thereto in *Harmony Innovation Shipping Limited v. IOF Pte. Ltd.*, 12 CIV 23200 (CMA) (S.D. Fla.).

59. The defendants are not treated as independent profit centers. Instead, all of their financial results are consolidated in BHATIA PTE's financial statements.

60. The subsidiaries are also completely dependent upon BHATIA PTE for their financial viability. For instance, BHATIA PTE's 2011 Financial Statement provides that it "has undertaken to provide continuing financial support to [GURU, INDORE, GREGARIOUS and PATRIOTIC] to enable them to continue as a going concern[s] and to meet their obligations as and when they fall due." (Ex. C at 79).

61. The defendants do not deal with one another at arm's length. For instance, BHATIA PTE's 2011 Financial Statement provides that BHATIA PTE made over $50 million in "quasi equity loans granted to subsidiaries [that] are unsecured, interest free and are not expected to be repaid within the next financial year." (Ex. C at 50). Companies dealing at arm's length with one another ordinarily seek security for multi-million dollar loans, charge interest, and expect to be repaid in a timely manner.

62. Likewise, in connection with a loan extended by Bank of Baroda to GURU for purchasing the M/V GURASIS, BHATIA agreed to charter the vessel to the extent necessary to ensure that the vessel carried a minimum of 500,000 MT of cargo per annum. Ordinarily,

companies dealing at arm's length do not agree to charter vessels unless they have an economic need for the vessels to carry such cargo (Ex. G at 1-2).

63. Just as the defendants coordinated to insulate Ishhar from creditor enforcement efforts by removing $85 million from that entity in 2009, the defendants herein have taken other coordinated steps to protect their assets and frustrate creditors.

64. BHATIA, FLEETMAR, GURU and INDORE all engaged the same law firm to temporarily create quasi-presence in New York State in an effort to temporarily prevent Rule B attachments. Notably, though, the Defendants voluntarily revoked those protective measures, which are no longer in place, following legal developments which prevented the prior practice of attaching wire transfers. (Ex. H).

65. Also, on May 30, 2012, the defendants changed the name of the M/V HARKRIPA to MV ASHKNEER in an apparent effort to make it more difficult for creditors to locate the vessel.

66. The defendants are also currently changing ownership structures and appointing additional (though powerless) directors to further complicate the Bhatia Group's organization and impede creditor enforcement efforts.

67. The defendants are engaging in the exact same pattern of deception and fraud with two other creditors noted above (Norden and Harmony). In all three matters, IOF entered into a maritime COA, in all three matters one or more shipments were performed but IOF failed to pay in full and/or in all three matters IOF failed to provide further liftings beyond the initial ones, leaving all three creditors with substantial damages.

68. All of the foregoing factors demonstrate that the defendants are mere alter egos of one another and that the Bhatia Group of companies works together as a single economic unit. It

would therefore be fair and equitable for any asset of this enterprise, including any and all assets of any of the companies, to be subject to the claims of judgment creditors of any of the entities and for Plaintiff CROSSBRIDGE to attach any such assets as security for its maritime claims.

### Request for Rule B Relief

69. Upon information and belief, and after investigation, the Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, cargo, vessels, or any other assets of, belonging to, due or being transferred to, from, or for the benefit of the said Defendants (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in their name(s) or for their benefit, at, moving through, or being transferred to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

70. The total amount to be attached pursuant to the calculations set forth above is **$2,423,995.68**.

WHEREFORE, Plaintiff CROSSBRIDGE prays:

a. That process in due form of law according to the practice of this Court may issue against Defendants, citing them to appear and answer the foregoing, failing which default may be taken;

b. That if Defendants cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of Defendants up to and including the sum of **$2,423,995.68** be restrained and attached, including, but not limited to any

390536.1

cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, cargo and/or vessels, of, belonging to, due, held or being transferred to, from, or for the benefit of Defendants, or any of them, at, moving through or being transferred to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling the Defendants to arbitrate and/or for the recognition and enforcement of any award or judgment entered against the Defendants, or any of them, in the London arbitration proceedings; and

d. For such other, further and different relief, including but not limited to attorneys' fees, interest, costs and disbursements, as this Court may deem just and proper in the premises.

Dated: New York, New York
September 11, 2012

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
CROSSBRIDGE PROJECTS LIMITED

By: _____
Michael E. Unger
Lawrence J. Kahn
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

390536.1

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

LAWRENCE J. KAHN, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Lawrence J. Kahn

Sworn to before me this
11th day of September, 2012.

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2014

390536.1                                                16